**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **TICKETMASTER L.L.C.**, a limited liability company, <br><br> **TICKETMASTER ENTERTAINMENT L.L.C.**, a limited liability company, <br><br> **TICKETSNOW.COM, INC.**, a corporation, and <br><br> **TNOW ENTERTAINMENT GROUP, INC.**, a corporation, <br><br> Defendants. | **Case No.** _____ |

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

1

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3.  Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.  The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANTS

6.  Defendant Ticketmaster L.L.C. is a Virginia limited liability company with its principal place of business at 8800 West Sunset Boulevard, West Hollywood, California.  At all times material to this Complaint, acting alone or in concert with others, Ticketmaster L.L.C. has advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.  Ticketmaster L.L.C. transacts or has transacted business in this district.

7.  Defendant Ticketmaster Entertainment L.L.C. is a Delaware limited liability company with its principal place of business at 8800 West Sunset Boulevard, West Hollywood, California.  Ticketmaster Entertainment L.L.C. is the successor by merger to Ticketmaster Entertainment, Inc., as a result of the merger of Ticketmaster

Entertainment, Inc., and Live Nation, Inc., on January 25, 2010.  At all times material to this Complaint, Ticketmaster Entertainment, Inc., held the copyright for Ticketmaster L.L.C.'s website www.ticketmaster.com.  Ticketmaster Entertainment, Inc., also owned 100% of defendant TNOW Entertainment Group, Inc., which owns and operates defendant TicketsNow.com, Inc.  At all times material to this Complaint, acting alone or in concert with others, Ticketmaster Entertainment, Inc., advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.  Ticketmaster Entertainment L.L.C. transacts or has transacted business in this district.

8. Defendant TicketsNow.com, Inc., is an Illinois corporation with its principal place of business at 3800 Golf Road, Suite 125, Rolling Meadows, Illinois.  TicketsNow.com, Inc., operates the website www.ticketsnow.com, among others.  At all times material to this Complaint, acting alone or in concert with others, TicketsNow.com, Inc., has advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.  TicketsNow.com, Inc., transacts or has transacted business in this district.

9. TNOW Entertainment Group, Inc., is an Illinois corporation with its principal place of business at 620 N IL Route 31, Suite C, Crystal Lake, Illinois.  TNOW Entertainment Group, Inc., owns and operates TicketsNow.com, Inc., and holds the copyright for TicketsNow.com, Inc.'s website www.ticketsnow.com.  At all times material to this Complaint, acting alone or in concert with others, TNOW Entertainment Group, Inc., has advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.  TNOW Entertainment Group, Inc., transacts or has transacted business in this district.

**COMMERCE**

10. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

11. At all times material to this Complaint, Defendants Ticketmaster L.L.C. and Ticketmaster Entertainment L.L.C., through Ticketmaster Entertainment, Inc. (collectively hereafter "Ticketmaster"), have provided primary ticketing services for a variety of events, including, but not limited to, concerts, sporting events, and theater performances. Ticketmaster contracts with event venues, promoters, and sports teams to provide ticketing services on their behalf. Typically, the venue, promoter, or team allocates a certain number of tickets to an event for sale to the general public and releases those tickets to Ticketmaster to sell to the public. For concert events, ticket prices are typically set by the artist. This original price is often referred to as the "face" value of a ticket. The primary channel through which consumers purchase tickets from Ticketmaster is its Internet website, www.ticketmaster.com.

12. At all times material to this Complaint, Defendants, through TicketsNow.com, Inc., and TNOW Entertainment Group, Inc. (collectively "TicketsNow"), have provided a ticket resale marketplace where consumers can buy event tickets that are being offered by resellers, such as professional ticket brokers and other individuals, on the so-called "secondary market." The primary channel through which consumers purchase event tickets from TicketsNow is through the Internet website www.ticketsnow.com. On this website, TicketsNow lists tickets for sale to various types of events, including, but not

limited to, concerts, sporting events, and theater performances.  TicketsNow does not provide primary ticketing services.

**Ticketmaster.com**

13. At all times material to this Complaint, consumers interested in purchasing tickets to an event for which Ticketmaster provided primary ticketing services could search for available tickets on the website www.ticketmaster.com.  Once a consumer navigated the website and found a specific event, he could search for available tickets by specifying, among other things, how many tickets he wished to purchase and, if applicable, the seating section for, or price level of, the tickets he wanted.  Ticketmaster's website system then searched its inventory to determine whether it had tickets available that satisfied the consumer's criteria.  If the system identified available tickets, the consumer was given the option of purchasing the tickets.  If the system did not find tickets available, a webpage notified the consumer of that fact.

14. From approximately October 2008 through approximately February 2009, for certain events listed on www.ticketmaster.com, Ticketmaster used a "No Tickets Found" page (the "NTF page") to notify consumers that there were no tickets available that satisfied their search criteria.  [*See* Exhibit 1]  The NTF page stated, in bright orange font: "**Sorry, no exact matches were found, but other tickets may still be available**" and contained the Ticketmaster logo in the upper left and lower right corners.  The left side of the page indicated that the consumer could "Try the following:" "Search again" or "Keep checking back."  Consumers who wanted to "Search again" could click on a bright orange button labeled "**Back**."

15. The right side of the NTF page stated: "**Expand your search at TicketsNow**." This side of the NTF page displayed a logo that read "TicketsNow, a Ticketmaster company" and listed five categories of available tickets and the applicable price ranges – which were based on actual, real-time existing inventory on www.ticketsnow.com provided by TicketsNow. Below the ticket price ranges was a bright orange button labeled "**View All Tickets**." Consumers who clicked on the "View All Tickets" button were directed to a ticket listing page on the www.ticketsnow.com website, which listed tickets available for the specific event the consumer was searching. In many cases, the tickets on www.ticketsnow.com were priced substantially higher than face value.

16. The NTF Page was displayed when Ticketmaster's website system found no tickets available that satisfied a consumer's search criteria, even if some retail tickets to the event were still available. Therefore, in some instances, Defendants steered consumers from the Ticketmaster retail website to TicketsNow's resale website even when retail tickets to the event were still available.

**TicketsNow.com**

17. At all times material to this Complaint, a consumer who went to www.ticketsnow.com could view a "ticket listing page" for a specific event. TicketsNow provided the following information for each ticket listing: the venue section and row, if applicable, where the seats were located; the price of the tickets, not including service and shipping fees ("list price"); the quantity of tickets available; and a "notes" indicator, if the reseller had posted notes for that listing. To access the text of the notes, a consumer had to click on a highlighted word "notes," which would expand a viewable notes field.

18. At all times material to this Complaint, the list price for each ticket listed on www.ticketsnow.com represented the price set by the actual reseller (*e.g.*, the broker) plus a two percent (2%) to eight percent (8%) mark-up by TicketsNow. In numerous instances, the list price substantially exceeded the face value. TicketsNow did not display the original or face value price of tickets on www.ticketsnow.com.

19. After a consumer selected the tickets he wanted to purchase, he proceeded through the check-out process. [*See, e.g.,* Exhibit 2] After the consumer placed his order, TicketsNow sent the consumer an "Order Received" email setting forth a summary of the consumer's order, including: the event name, date, and venue; the section and row of the tickets purchased; applicable notes; and the subtotal cost of the tickets along with the applicable service charge and shipping fee. [*See, e.g.,* Exhibit 3]

20. At some point thereafter, TicketsNow contacted the ticket reseller who had listed the ticket to confirm the ticket sale. If the reseller confirmed the order, TicketsNow charged the consumer for the purchase and sent the consumer an "Order Confirmation" email. [*See, e.g.,* Exhibit 4] This email provided another summary of the consumer's order and indicated that TicketsNow had secured the tickets and processed payment for the order. For each ticket purchase, TicketsNow charged consumers a total amount equaling: (1) the list price for the tickets; (2) a "Service Charge" fee equal to 15% of the list price; and (3) a "Shipping" fee. In addition, this email guaranteed delivery of the tickets in time for the event.

21. Finally, TicketsNow sent an invoice to consumers. [*See, e.g.,* Exhibit 5] The invoice again summarized the consumer's order – this time including, in numerous instances, the

seat numbers of the tickets – and repeated the guarantee, in prominent red text, that the consumer "will receive [the] tickets in time for the event."

22. To a consumer, it appeared that TicketsNow was the reseller of the tickets. TicketsNow did not display the identity of the actual reseller on www.ticketsnow.com or in any of its correspondence with consumers. Moreover, when tickets were ultimately shipped to a consumer, the reseller used a Federal Express airbill provided by TicketsNow, or similar shipping method, with a return address for TicketsNow.

23. During the relevant time period, TicketsNow offered for sale both "in hand" and "speculative" tickets. TicketsNow considered "in hand" tickets to include actual tickets physically in a seller's possession, as well as tickets to which a reseller claimed to have rights to obtain. "Speculative" tickets were "take order" tickets for which a ticket broker had nothing more than an anticipation of procurement based on the broker's own knowledge of the market and industry. Until early June 2009, TicketsNow allowed approximately 15-20 "preferred" brokers to post listings for "speculative" tickets as well as "in hand" tickets.

24. TicketsNow did not display or otherwise convey to consumers whether a ticket was in the actual possession of the reseller, was promised to the reseller, or was a "take order" for a ticket. To the consumer, it appeared that all tickets were *actual* tickets in the possession of TicketsNow. In some cases, the "notes" field for a ticket listing, once expanded and viewable, might contain statements such as "comparable or better" or "delivery after [some later date]"; however, such statements did not inform consumers that the tickets were not in the reseller's physical possession. Moreover, none of the communications

sent to consumers – the "Order Received" email, "Order Confirmation" email, or the invoice – indicated the type of ticket that the consumer had ordered.

25. At all times material to this Complaint, TicketsNow's system was designed such that "in hand" ticket listings were automatically removed from [www.ticketsnow.com](www.ticketsnow.com) once a consumer ordered a ticket through that listing. However, TicketsNow did not employ a similar system for "speculative," or "take order," ticket listings. "Speculative" ticket listings could generate multiple orders; that is, multiple consumers could place orders for tickets through a single ticket listing. "Speculative" ticket listings had to be manually removed from the website either by the listing broker or by TicketsNow.

26. In numerous instances, Defendants have failed to provide consumers with the specific tickets that they had purchased from TicketsNow, including both purported "in hand" tickets and "speculative" tickets.

**Springsteen Concert Tour Onsale – February 2, 2009**

27. On February 1, 2009, Bruce Springsteen & The E Street Band ("Springsteen") performed during half-time at the National Football League's Superbowl XLIII in Tampa, Florida, which was broadcast live on national television.

28. On February 2, 2009, Defendants marketed, promoted, offered for sale, and sold tickets for sixteen upcoming Springsteen concerts. These concerts were scheduled to be performed in April and May of 2009 at a total of fourteen venues, including the Izod Center in New Jersey, Mellon Arena in Pittsburgh, the Verizon Center in Washington, D.C., the Pepsi Center in Denver, and the Los Angeles Sports Arena in Los Angeles.

29. Ticketmaster provided primary ticketing services for these concerts. Tickets for the Springsteen concerts were available for purchase through all Ticketmaster channels,

including www.ticketmaster.com, and were offered at two price levels: typically, $65 and $95. There were no fan club pre-sales or other pre-sale events for the Springsteen concerts through which tickets could have been obtained prior to February 2, 2009, the date on which the tickets were released for sale to the public ("onsale").

30. The number of tickets made available on February 2, 2009, for sale to the public through Ticketmaster for each of the Springsteen concerts ranged from roughly 10,000 to nearly 17,000.

31. Demand for tickets to the Springsteen concerts was high. As soon as the tickets went on sale, tens of thousands of consumers attempted to purchase tickets through www.ticketmaster.com.

32. Within minutes or even seconds of the tickets going on sale, Ticketmaster displayed the NTF page, described in Paragraphs 14 and 15, above, to thousands of consumers, representing that the tickets requested by these consumers were not available. Many of these consumers then clicked on the "View All Tickets" button described in Paragraph 15, above, and were re-directed to www.ticketsnow.com.

33. A substantial number of consumers who clicked on the "View All Tickets" button and were re-directed to www.ticketsnow.com did not realize that they were being steered from Ticketmaster's primary sale website to Defendants' resale website where tickets were being sold by resellers at prices substantially higher than face value. They believed they were simply on another part of the www.ticketmaster.com website or on a Ticketmaster-affiliated retail website.

34. Many consumers who were steered to the www.ticketsnow.com website proceeded to purchase tickets for one of the Springsteen concerts for substantially more than the

original or face value of the tickets.  For example, some lower level tickets were sold for $195, $305, and even $629 per ticket, while some general admission floor tickets were sold for $189, $213, and $306 per ticket.

35. Almost immediately after the onsale, a substantial number of consumers who had been steered from www.ticketmaster.com to www.ticketsnow.com and purchased Springsteen concert tickets at resale prices complained that they had been deceived.

**Verizon Center Oversell**

36. Prior to the onsale, Defendants had listed an estimated 300 tickets to the Springsteen concert scheduled for May 18, 2009, at the Verizon Center in Washington, D.C. ("Verizon Center Concert") on www.ticketsnow.com.  Among the listings for the Verizon Center Concert were approximately thirty-seven (37) "speculative" tickets from one "preferred" broker ("Broker").

37. On February 2, 2009, approximately 12,500 tickets for the Verizon Center Concert were released for sale to consumers through Ticketmaster.  The available retail tickets effectively sold out within one hour after the onsale began.

38. On February 2, 2009, TicketsNow received and accepted approximately 626 orders from consumers for a total of approximately 1,614 tickets for the Broker's "speculative" ticket listings.  Most, if not all, of these orders were placed by consumers who had been steered to www.ticketsnow.com through the Ticketmaster NTF page.  Within 48 hours of the onsale, Defendants charged consumers' credit cards for these ticket orders an amount that equaled the list price of the tickets, plus a 15% service fee and delivery fees ("purchase price").

39. For Defendants, this was an unusually high number of "speculative" ticket orders for a single concert on the initial onsale date. Moreover, the 1,614 tickets ordered were equivalent to more than 10% of the total number of tickets that had been made available to the public by Ticketmaster.

40. Shortly thereafter, in early February, the Broker advised TicketsNow that it would not be able to fill all of the Verizon Center Concert orders processed by TicketsNow. On February 17, 2009, the Broker notified TicketsNow that it thought it could fulfill orders for at least 532 of the 1,614 tickets ordered.

41. TicketsNow did not immediately inform consumers who had placed orders for the Broker's "speculative" ticket listings ("Affected Consumers") that there were not enough available tickets in the market to fulfill their orders.

42. In March 2009, Defendants contacted some Affected Consumers to ask whether they would be interested in switching to better seats at a Springsteen concert on a different date and at a different venue. At this time, Defendants did not inform any Affected Consumers that there were not enough available tickets to fulfill their orders, nor did they offer Affected Consumers the opportunity to cancel their orders and receive a refund. Nonetheless, any consumer who affirmatively requested that his order be cancelled was provided a full refund.

43. In April 2009, Defendants continued contacting Affected Consumers whose orders had not been fulfilled to offer them "upgraded" tickets to other Springsteen concerts. Consumers who declined this offer were informed that TicketsNow would "continue sourcing" their tickets, and that the tickets would ship out by the date stated in their invoices. Again, Defendants did not inform Affected Consumers that there were not

enough available tickets to fulfill their orders or offer them the opportunity to cancel their orders and receive a refund.

44. On or around May 6, 2009, less than two weeks before the Verizon Center Concert, Defendants began calling Affected Consumers whose orders remained open to notify them that their orders could not be fulfilled. Defendants offered the following tiered options to Affected Consumers (offering the next option only if the previous one was rejected): (1) seats at a different Bruce Springsteen concert plus up to $150.00 for a one-night hotel stay and a $75.00 gas credit; (2) refund of the purchase price from the original order plus a TicketsNow gift card for the same amount; or (3) a 200% refund of the purchase price of the original order.

45. In numerous instances, TicketsNow had charged Affected Consumers on or around February 2, 2009, for ticket orders it could not and did not fulfill. In the end, nearly half of the Affected Consumers did not get the tickets for which they had paid. More than one-third of the orders at issue were ultimately cancelled.

## DEFENDANTS' VIOLATIONS OF THE FTC ACT

46. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

47. Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### Deceptive Failure to Disclose Facts Regarding Ticket Resale Website

48. In numerous instances during the time period from approximately October 2008 to February 2009, in connection with the advertising, marketing, promotion, offering for sale, or sale of event tickets on the website www.ticketmaster.com, Defendants represented, directly or indirectly, expressly or by implication, that the specific tickets requested by consumers were not available but other tickets to the event were available. Defendants then steered consumers to the website www.ticketsnow.com through their representation to "View All Tickets."

49. In numerous instances in which Defendants made the representation set forth in Paragraph 48 of this Complaint, Defendants failed to adequately disclose to consumers that: (1) by clicking on the "View All Tickets" button, consumers would leave the Ticketmaster website and be redirected to www.ticketsnow.com;
(2) www.ticketsnow.com was a ticket resale website and not the primary seller for event tickets; and (3) www.ticketsnow.com offered tickets at market value, which in many instances substantially exceeded the face value of the tickets. This information would be material to consumers in deciding to purchase tickets through www.ticketsnow.com. The failure to disclose this information resulted in consumers unknowingly paying substantially more than face value for their tickets.

50. Defendants' failure to adequately disclose the material information described in Paragraph 49, above, in light of the representation described in Paragraph 48, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Deceptive Sale of Certain Tickets on TicketsNow.com

51. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of event tickets on the website www.ticketsnow.com, Defendants have represented, directly or indirectly, expressly or by implication, that tickets listed for sale on that website were in the possession of TicketsNow or its resellers and secured for resale to consumers at the time the tickets were listed for sale and paid for by a consumer.

52. In fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 51 of this Complaint, TicketsNow or its resellers did not possess and had not secured for resale to consumers certain tickets at the time the tickets were listed and paid for by a consumer.

53. Therefore, Defendants' representation as set forth in Paragraph 51 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Deceptive Failure to Disclose Facts Regarding Status of Tickets Offered to Consumers on Ticketsnow.com

54. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of event tickets on the website www.ticketsnow.com, Defendants have represented, directly or indirectly, expressly or by implication, that tickets offered for sale on that website are in the possession of TicketsNow or its resellers

        and are secured for resale to consumers at the time the tickets are listed for sale and paid for by a consumer.

55.    In numerous instances in which Defendants have made the representation set forth in Paragraph 54 of this Complaint, Defendants have failed to adequately disclose to consumers that, in fact, tickets listed for sale on www.ticketsnow.com fall into three categories: (1) physically in hand; (2) promised to a reseller for resale; and (3) a "take order" offer by a reseller to seek to procure a ticket. This additional information would be material to consumers in deciding to purchase tickets through www.ticketsnow.com.

56.    Defendants' failure to adequately disclose the material information described in Paragraph 55, above, in light of the representation described in Paragraph 54, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Unfair Practices Regarding "Speculative" Tickets

57.    In numerous instances on or around February 2, 2009, Defendants charged consumers for "speculative" ticket orders for the Verizon Center Concert, retained the consumers' money for more than three months without a reasonable basis for believing that they could fulfill these orders, failed to notify consumers for more than three months that they would not be able to fulfill these orders, and ultimately did not fulfill these orders.

58.    Defendants' actions caused or were likely to cause substantial injury to consumers that consumers could not reasonably avoid and that was not outweighed by countervailing benefits to consumers or competition.

59.  Therefore, Defendants' practices as described in Paragraph 57, above, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), 45(n).

## CONSUMER INJURY

60.  Consumers have suffered substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

61.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of the FTC Act. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

   A.   Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

   B.   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

    C.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:   February 18, 2010                    Respectfully submitted,

WILLARD K. TOM
General Counsel

KIAL S. YOUNG
DEVIN W. DOMOND
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Room NJ-3212
Washington, D.C.  20580
(T) 202-326-3525 (Young)
(T) 202-326-2610 (Domond)
(F) 202-326-3259

s/Guy G. Ward
GUY G. WARD, Ill. Bar No. 6217011
Federal Trade Commission
55 West Monroe Street
Suite 1825
Chicago, IL 60603
(T) 312-960-5612
(F) 312-960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION